**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION**

POLYMERIC RESOURCES
CORPORATION, a New Jersey corporation,
and CUSTOM RESINS, INC., a Kentucky
corporation,

            Case No.
            Hon.

        Plaintiffs,            Magistrate Judge:

v.

DONN DUMOUCHELLE, an individual
Michigan resident, LINDA
DUMOUCHELLE, an individual Michigan
resident, and CUSTOM RESINS INC., a
Michigan corporation,

        Defendants.

_____/

**VERIFIED COMPLAINT FOR TEMPORARY RESTRAINING ORDER,
PRELIMINARY INJUNCTION, AND FOR DAMAGES**

Plaintiffs, Polymeric Resources Corporation, a New Jersey corporation ("Polymeric"), and Custom Resins, Inc., a Kentucky corporation ("CRI Kentucky") state:

*Parties*

1.      Polymeric is a corporation organized under the laws of the State of New Jersey.  Its principal place of business is in Wayne, New Jersey.

2.      CRI Kentucky is a corporation organized under the laws of the State of Kentucky.  Its principal place of business is in Henderson, Kentucky.

3.      Polymeric is the parent company of CRI Kentucky.

4.      Defendant Donn Dumouchelle is an individual resident of Oakland County, Michigan.

{00286064}

5.     Defendant Linda Dumouchelle is an individual resident of Oakland County, Michigan.

6.     Defendant Custom Resins Inc. is a Michigan corporation ("CRI Michigan") with its principal place of business in Rochester Hills, Michigan.

*Jurisdiction  and Venue*

7.     This Court has jurisdiction over Defendants and the matters contained herein under 28 U.S.C. § 1332, because there is complete diversity of citizenship between the Plaintiffs and the Defendants, and the amount in controversy exceeds $75,000.00, exclusive of interest, costs and attorneys fees.

8.     Venue is proper pursuant to 28 U.S.C. § 1391 because each Defendant resides or has its principal place of business within the Eastern District of Michigan.

*The Nature of Plaintiffs' Business Operations*

9.     Polymeric, through its affiliate CRI Kentucky and otherwise, is in the business of the development, manufacture and sale of engineered thermoplastics, such as nylon polymers, co-polymers, and specialty polymers for a variety of markets throughout the United States and overseas.  Plaintiffs' materials can be found in automotive parts, wires and cables, molded items such as office furniture and storage tanks, food packaging, and lawn and garden tools, among other things.

10.     Plaintiffs have established a valuable and extensive trade in their products, which has been developed at a considerable expense over a period of more than thirty (30) years.

11.     Plaintiffs are engaged in a highly competitive industry.  Preserving certain competitive advantages requires that Plaintiffs maintaining the confidentiality of their proprietary and trade secret information.

## *The Defendants*

12.     Defendant Donn Dumouchelle entered into an independent contractor relationship with the Plaintiffs in or about 1996 to act as a sales representative for of Plaintiffs' products to the automotive and allied industries in Michigan.  Copies of the Independent Contractor Agreement between Dumouchelle and CRI Kentucky, and the Agent Agreement between Dumouchelle and Polymeric, are attached as Exhibits 1 and 2 (sometimes referred to collectively as the "Agreements").

13.     Dumouchelle started a Michigan corporation, Defendant CRI Michigan, to conduct business operations for the performance of his duties as sales representative.[1]

14.     As Michigan sales representative for the Plaintiffs, Dumouchelle's duties and responsibilities included, among other things, to manage and grow sales of Plaintiffs' products to Plaintiffs' customers in the State of Michigan, to initiate customer contacts and maintain customer relations, and to devote his time and effort to the performance of such duties for the benefit of Plaintiffs.  *See*, e.g. Exhibit 1 at p. 1 and p. 7; Exhibit 2 at pp. 1 - 2.

---

[1] Dumouchelle agreed that CRI Kentucky could purchase CRI Michigan for one dollar ($1.00) if the Agreement is terminated.  See Exhibit 1 at p. 8, paragraph 8 of Schedule B.  That purchase option is being exercised as of the date of this writing, via letter to Donn Dumouchelle and tender of the agreed one dollar payment.  As of this writing, however, CRI Kentucky has not yet received custody and control of CRI Michigan or its property and assets (if any).

15.     Dumouchelle was permitted under the Agreements to represent other manufacturers of non-competitive products as well, subject to Plaintiffs' prior consent. Exhibit 1 at p. 7; Exhibit 2 at p. 2, section VI.2.

16.     At all times, the purchasers and prospective purchasers of Plaintiffs' products were Plaintiffs' customers, and the benefits of those relationships belonged to the Plaintiffs.  *See*, e.g. Exhibit 2 at p. 2, section 5 b):

> "It is clearly understood that all accounts both potential and active developed by the Agent are clearly Company accounts and will be invoiced by the Company.  Final account credit approval responsibility rests with the Company."

17.     Plaintiffs agreed to pay commissions to Dumouchelle upon certain specified terms as set forth in the Agreements and to provide an automobile for Dumouchelle's business use.  CRI Kentucky also furnished, or reimbursed Dumouchelle and/or CRI Michigan for, a lease for office space in Michigan, as well as office equipment, telephones and computer equipment, and reimbursement for office staff salaries.  Exhibit 2 at p. 1, sections IV. and V.; Exhibit 1 at p. 2, section 3.

18.     Plaintiffs have performed all of their obligations under the Agreements.

*Plaintiffs' Trade Secrets and Confidential Information*

19.     In performing as a sales representative for Plaintiffs' products, Dumouchelle had access to certain confidential trade secrets and confidential proprietary information, including, but not limited to, customer pricing, customer requirements, customer lists, customer sales volumes, costs of production, methods, systems and formulas, and other competitive business information (collectively, the "Trade Secrets and Confidential Information").

{00286064}                                          4

20.     Dumouchelle was, at all relevant times, under a duty to maintain the confidentiality of the Trade Secrets and Confidential Information and to use the same only for promoting sales of Plaintiffs' products for Plaintiffs' benefit.  This duty arose under the Agreements[2] and also arose independently of the Agreements, under common law principles of fiduciary duty as well as the statutory law of both Michigan and Kentucky.  *See* Mich. Comp. Laws § 445.1901 et seq., Kentucky Rev. Stat. § 365.880 et seq.

21.     Plaintiffs treat the Trade Secrets and Confidential Information as confidential and maintain that confidential status with care.  For example, and without limitation, the Trade Secrets and Confidential Information are not publicly disseminated or generally available, Plaintiffs each maintain a company policy against unauthorized use or disclosure, and Plaintiffs obtain confidentiality agreements prohibiting the use or disclosure of the Trade Secrets and Confidential Information from sales representatives such as Dumouchelle.

22.     The Trade Secrets and Confidential Information have economic value to Plaintiffs from not being generally known to, and not being readily ascertainable by, competitors or other persons who might obtain economic value from its disclosure or use.

23.     The development of the Trade Secrets and Confidential Information has cost Plaintiffs a substantial amount of money and time to develop and preserve.

*Misappropriation of Plaintiffs' Trade Secrets and Confidential Information*

24.     Mr. Dumouchelle suffered a stroke in November of 2009, from which he has, unfortunately, not fully recovered.

---

[2]  *See* Exhibit 1 at pp. 2 – 3, section 4, "Secrets," covering "any trade secrets or any other like information of value relating to the business and/or field of interest of [CRI Kentucky], [or] any affiliate . . .. "  See also Exhibit 2 at pp. 5 – 6, section XII., "Secrets."

25.     It was Mr. Dumouchelle's *personal* services as sales representative for which Plaintiffs contracted.  Since Mr. Dumouchelle's stroke, however, he has been unable to provide the time, effort and personal involvement required to fulfill his obligations and duties under the Agreements.

26.     Mr. Dumouchelle's wife, Linda, subsequently became involved in certain aspects of CRI Michigan, but her involvement has not filled the void left by the diminution in Dumouchelle's ability to personally perform as sales representative.

27.     On the contrary, in Plaintiffs' business judgment, Mrs. Dumouchelle's involvement in the sales organization has been detrimental to Plaintiffs' business and customer relationships.  As an example, Mrs. Dumouchelle purported to unilaterally fire a key CRI Michigan employee whose contributions, especially in the wake of Mr. Dumouchelle's incapacity, were deemed valuable by Plaintiffs.

28.     The Agreements have been terminated for cause.

29.     Plaintiffs and Dumouchelle have engaged in discussions concerning a final windup of the business between them and a transition of physical control of the CRI Michigan office (and property, if any) to Plaintiffs.  During one such discussion, which occurred in September 2010, Plaintiffs informed the Dumouchelles and their accountant that Linda Dumouchelle was not authorized to have any involvement with the Plaintiffs' business or sales representation of the Plaintiffs.

30.     From Plaintiffs' perspective, that discussion was amicable and it was understood that Plaintiffs would present a windup proposal to the Dumouchelle's accountant shortly after Thanksgiving.

31.     On or about Thursday, November 18, 2010, Plaintiffs' management became aware through an employee based in Michigan that the day or night before, November 17, 2010, the Dumouchelles (and/or someone acting in concert with them) had removed all of the telephones and hard copy records and customer files from the CRI Michigan office without warning or authorization.

32.     Such records and files consist of Plaintiffs' Trade Secrets and Confidential Information, including but not limited to information concerning Plaintiffs' customers and the pricing, requirements, contact information, and sales volumes of the customers, as well as other proprietary and confidential trade secret information about Plaintiffs' business processes and operations as described in paragraph 19 above.

33.     Also on Thursday, November 18, 2010, Mr. Ronald Bailey, Vice Preisdent of Sales for Polymeric and CRI Kentucky, received a telephone voice message from an attorney in Michigan, Dennis Rauss, who indicated that he represents Dumouchelle and that unless he heard from Mr. Bailey immediately he intended to file a lawsuit against him.

34.     Plaintiffs' counsel in New Jersey called Mr. Rauss on November 18, 2010very shortly after Mr. Rauss' call to Mr. Bailey, and left a message asking for a return phone call.  Plaintiffs' counsel also followed up his voice message with a letter to Mr. Rauss that same day.  Among other things, the letter demanded the immediate return of all of the business records and customer files taken by the Dumouchelles.  See Exhibit 3.  As of this writing, no response has been forthcoming to the voice message or the letter and none of the records or customer files have been returned.

35.     Upon information and belief, the Dumouchelles intend to hold Plaintiffs' Trade Secrets and Confidential Information hostage as leverage in negotiating a windup of affairs with Plaintiffs, and/or intend to use and disclose Plaintiffs' Trade Secrets and Confidential Information for their own gain, to the detriment of Plaintiffs, in violation of the Agreements and the duties described in paragraph 20 above.

36.     The Dumouchelles' actions have utterly disabled Plaintiffs' sales organization in Michigan and have placed Plaintiffs' goodwill and business reputations, as well as millions of dollars of sales, in immediate jeopardy.

37.     In the short time since Plaintiffs became aware of the Dumouchelles' wrongful actions, Plaintiffs have learned that Linda Dumouchelle has been taking items from the CRI Michigan office during each of the past few weekends and also has changed the locks on the CRI Michigan office.  Those activities, Plaintiffs believe, were part of a concerted scheme which culminated in the Dumouchelles virtually emptying the CRI Michigan office of business records, customer files, and telephones on November 17, 2010.

38.     Absent immediate injunctive relief, including a temporary restraining order followed by a preliminary injunction, Plaintiffs will suffer irreparable harm to their customer relationships, business reputation, competitive position, and business goodwill.

### Count I
### Misappropriation of Trade Secrets
### and Confidential Information

39.     Plaintiff incorporates each of foregoing paragraphs as though fully set forth herein.

40.     Donn Dumouchelle, Linda Dumouchelle, and CRI Michigan each has and had, at all relevant times, legal duties to refrain from using, disclosing, secreting, and dispossessing Plaintiffs of the Trade Secrets and Confidential Information.

41.     The Restatement on Agency §396(b) states:

> Unless otherwise agreed, at the termination of the agency, the agent:

> (b) has a duty to the principal not to use or to disclose to third persons on his own conduct, or for account of others, in competition with the principal, or to his injury, trade secrets, written list of names or other similar confidential matters given to him only for the principal's use or required by the agent in violation of duty.

42.     An agent owes his former principal "the duty not to take advantage of a still subsisting confidential relation created during the prior agency relationship."   *See*, e.g. *Chemtrend, Inc. v. McCarthy*, 780 F.Supp. 458, 459 (E.D. Mich 1981).

43.     In addition, both Michigan and Kentucky have enacted the Uniform Trade Secrets Act to protect trade secrets and confidential information used in business.

44.     Defendants have willfully and maliciously misappropriated and converted Plaintiffs' Trade Secrets and Confidential Information in violation of contractual, common law, and statutory prohibitions.

45.     As a direct and proximate result of Defendants' misappropriation of the Trade Secrets and Confidential Information, Plaintiffs have suffered, and continue to suffer, damages in excess of $100,000.00 plus costs, interest and attorneys' fees.

**WHEREFORE**, Plaintiffs respectfully request that this Honorable Court enter a judgment in favor of each of them against each of the Defendants, jointly and severally, for all damages caused by their misappropriation of the Trade Secrets and Confidential Information including, but not limited to direct, indirect, incidental, and consequential

damages, exemplary damages, loss profit, interest, costs and attorneys' fees, and grant such other relief as is just and equitable.

## Count II
### Injunctive Relief

46.    Plaintiffs incorporate each of the foregoing paragraphs as though fully set forth herein.

47.    Plaintiffs will be immediately and irreparably injured and damaged if Defendants are permitted (1) to continue to use, appropriate and/or disclose the Trade Secrets and Confidential Information, (2) to possess the same to the exclusion of Plaintiffs, or (3) to solicit Plaintiffs' current and/or prospective customers or business relationships.

48.    In the absence of immediate injunctive relief, Plaintiffs will suffer irreparable harm to their customer relationships, business reputation, competitive position, and business goodwill, as well as substantial amounts of sales revenue.

49.    Delay in obtaining injunctive relief will cause immediate and irreparable harm to Plaintiffs.  Each day that Defendants are able to retain the Trade Secrets and Confidential Information, which were wrongfully obtained, Plaintiffs' reputation and good will among its current and prospective customers will be damaged, which may be impossible to repair, and the value of which may be difficult to determine.  *See*, e.g. *Borman's, Inc. v. Great Scott Super Markets, Inc.,* 433 Fsupp 343, 347 (D. Mich. 1975) (damages for loss of business, customers, profits and goodwill are manifestly difficult of computation and constitute irreparable harm); *Zurn Constructors, Inc. v. B F. Goodrich Co.,* 685 F Supp. 1172, 1178 (D Kan 1988) (recognizing that loss of goodwill and loss of customers can constitute irreparable harm).

50.     The Trade Secrets and Confidential Information are generally not known to the public and are protected from disclosure by Plaintiffs.

51.     Under the Agreements, Dumouchelle expressly agreed that the information, records, and files at issue belong to Plaintiff and are to be maintained as confidential at all times, to be used only for Plaintiff's benefit and not otherwise.  Exhibit 1 at pp. 2 – 3, section 4, "Secrets;"  Exhibit 2 at pp. 5 – 6, section XII., "Secrets."

52.     No adequate remedy at law exists to redress this intentional, ongoing breach and unlawful use by Defendants of Plaintiffs' Trade Secrets and Confidential Information.  Plaintiffs have no adequate remedy at law because the substantial injury that Defendants are causing, and will continue to cause unless immediately restrained, will lead to a loss of (among other things) competitive position, business goodwill, and customer relationships.

53.     Public policy discourages unfair competition as well as the conversion and misappropriation of another's trade secrets and confidential information.

54.     Plaintiffs have not provided prior notice of their request for a Temporary Restraining Order because (1) the immediate and irreparable injury, loss, or damages described above will result before Defendants can be heard in opposition, and because (2) notice, by itself, may precipitate Defendants into inflicting more irreparable harm.

55.     Plaintiffs believe that no security is required for the issuance of a preliminary injunction or a temporary restraining order.  Plaintiffs' request for injunctive relief does not damage Defendants because it seeks to restrain them from acts which they have a duty not to take, using valuable information that does not belong to them.

**WHEREFORE,** Plaintiffs pray that this Honorable Court:

(a) Enter a Temporary Restraining Order restraining and enjoining each Defendant and any agents, servants, employees, representatives, and attorneys of any of them, and those persons in active concert or participation with any of them who receive actual notice of the Temporary Restraining Order by personal service or otherwise, from:

(i)         directly or indirectly soliciting or performing work to or for current or prospective customers of either of the Plaintiffs;

(ii)        using, appropriating, or disclosing the Trade Secrets and Confidential Information;

(iii)       failing to immediately turn over the Trade Secrets and Confidential Information to Plaintiffs;

(iv)        being employed or used by Employers Resource in any capacity, directly or indirectly, for six (6) months from the date of this Court's Temporary Restraining Order.

(b)  enter an order to show cause why a preliminary injunction shall not be issued under same terms and conditions described in paragraph (a) above;

(c)  after a hearing, enter a preliminary injunction enjoining Defendants from acting as described in paragraphs (a) above; and

(d)  enter a permanent injunction as described in paragraph (a) above; and

(e)  grant such other relief as is just and equitable.

## Count III
## Breach of Contract

56.     Plaintiffs incorporate each of the foregoing paragraphs as though fully set forth herein.

57.     Donn Dumouchelle breached the Agreements by, among other things, failing to perform his obligations thereunder and by removing and secreting Plaintiffs' Trade Secrets and Confidential Information.

58.     As a direct and proximate result of Dumouchelle's breaches, Plaintiffs have suffered, and continue to suffer, severe and substantial damages totaling in excess of $75,000.00 plus interest, costs, and attorneys fees.

**WHEREFORE**, Plaintiffs respectfully request that this Honorable Court (i) enter a judgment in favor of each of them and against Donn Dumouchelle for all damages caused by his breaches of the Agreements, including but not limited to direct, incidental, and consequential damages, lost profits, and exemplary damages, plus interest, costs and attorneys' fees.

Respectfully submitted,

SCHAFER AND WEINER, PLLC

By: / s / Michael R. Wernette
          MICHAEL R. WERNETTE  (P55659)
          Attorneys for Plaintiffs
          40950 Woodward Ave., Ste. 100
          Bloomfield Hills, MI 48304
          (248) 540-3340
Dated:  November 24, 2010          mwernette@schaferandweiner.com

## VERIFICATION OF COMPLAINT

Pursuant To 28 U.S.C. §1746, I Certify Under Penalty Of Perjury That The Foregoing Is True And Correct.  Executed On _November 24_ , 2010

By: Arthur Z. Quint
Chief Financial Officer, Polymeric Resources Corp.
Chief Financial Officer, Custom Resins, Inc.

{00286064}                                       14

<u>ATTORNEY CERTIFICATION PURSUANT TO FED.R.CIV.P. 65(b)(1)(B)</u>

  I, Michael R. Wernette, Esq., as attorney for the Plaintiffs in the above-referenced action, hereby certify that I have not attempted to notify the Defendants in advance of the Plaintiffs' request for a temporary restraining order because the Plaintiffs believe, based on the actions by the Defendants as described in paragraphs 26 through 39 of the Verified Complaint above, that notice itself, as well as any delay occasioned by notice, will precipitate additional actions by Defendants to harm Plaintiffs' business, causing damage of an irreparable nature, which may include destroying or disseminating customer files and other Trade Secret and Confidential Information.  Based on the information available to me at this time, in my view the Plaintiffs' fear of such adverse action is reasonable and well founded.  Pursuant To 28 U.S.C. §1746, I certify under penalty of perjury that this Attorney Certification Pursuant to Fed.R.Civ.P. (only) is true and correct.   Executed on November 24, 2010.

    /s/  Michael R. Wernette (P55659)

EXHIBIT 1

*D Y started working @ CPI on 3/6/95*

## INDEPENDENT CONTRACTOR'S AGREEMENT

**This Agreement** made as of this 23rd day of February, 1995 between **CUSTOM RESINS, INC.** (the "Corporation"), and **DONN DUMOUCHELLE** (the "Contractor").

1. **ENGAGEMENT.**

As and when requested by the Company during the term of this Agreement, Contractor shall perform such services as are set forth on Schedule A attached hereto, as revised and modified from time to time, for the Company, for the period commencing _____ and ending _____ . The said two-year period during which Contractor shall serve in such full-time capacity shall be deemed the "Engagement Period" and shall hereinafter be referred to as such.

2. **SCOPE OF DUTIES AND PERMITTED ACTIVITIES.**

Contractor shall accept such duties which the Corporation may designate and will devote his time and effort during the Engagement Period to the performance of such duties. Contractor shall maintain his principal business location at such place in the State of Michigan he may determine. Contractor shall undertake such reasonable travel as the Corporation may request.

3. **ENGAGEMENT PERIOD-ANNUAL COMPENSATION.**

For the services and duties to be rendered and performed by Contractor, the

-1-

Corporation agrees to pay Contractor compensation as set forth in Schedule B, and payable in equal monthly installments. The Corporation shall also reimburse Contractor for the expenses reasonably and necessarily incurred in connection with his engagement. The Contractor shall maintain and submit detailed reports on all expenses in accordance with Corporation's procedures. The Corporation shall provide an automobile for Contractor's business use with appropriate insurance coverage.

4. **SECRETS.**

Contractor agrees that any trade secrets or any other like information of value relating to the business and/or field of interest of the Corporation, any affiliate, including but not limited to, information relating to inventions, disclosures, processes, systems, methods, formulae, patents, patent applications, machinery, materials, research activities and plans, costs of production, contract forms, prices, volume of sale, promotional methods, list of names or classes of customers, which he has heretofore acquired during this engagement by the Corporation, which he may hereafter acquire during the Engagement Period as the result of any disclosures to him, or in any other way, shall be regarded as held by him in a fiduciary capacity solely for the benefit of the Corporation, its successors or assigns, and shall not at any time, either during the term of this Agreement or thereafter, be disclosed, divulged, furnished, or made accessible by him to anyone, or be otherwise used by him, except in the regular course of business of the Corporation or its clients. Information shall for purposes of this Agreement be considered to be secret if not known by the trade generally, even though such information may have been disclosed to one or more third parties pursuant to distribution agreements, joint

-2-



research agreements or other agreements entered into by the Corporation or any of its clients.

## 5. TERMINATION FOR CAUSE.

The Corporation may unilaterally terminate this Agreement only for "cause". The term "cause", as used in this Agreement, shall include (a) Contractor's breach of any material provision of this Agreement; (b) Contractor's willful or repeated failure to comply with the Corporation's policies, rules and procedures as from time to time in effect, or (c) any conduct, actual or threatened, which is likely to bring public discredit or economic injury to the Corporation. In any such event of termination for "cause", this Agreement shall terminate on the date set forth in the notice to Contractor of such termination.

## 6. CONTRACTOR BENEFITS - INDEPENDENT CONTRACTOR.

Contractor shall perform his services pursuant to this Agreement as an independent contractor, and will neither act as, nor be deemed, an agent or employee of the Corporation for any purposes whatever. Contractor shall not be entitled to any medical insurance, retirement benefits, vacations, sick pay, severance pay or other benefits or compensation except as set forth herein, nor will Contractor acquire insurance coverages required to be provided to employees by any federal, state or local government, or any subdivision thereof. The Corporation shall, however, make same available to Contractor at the cost of same to the Corporation.

## 7. COVENANT NOT TO COMPETE.

During the one-year period next following the end of the Engagement Period, Contractor agrees not to compete as an employee, shareholder, consultant, or otherwise (whether directly or by stock interest or otherwise), in any business or industrial category in which the

-3-

Corporation is then substantially involved. The Corporation may apply to a court of competent jurisdiction for equitable relief in the event of any actual, or threatened breach by Contractor of this paragraph.  The provisions of this paragraph shall not apply in the event the Contractor's engagement is terminated without cause prior to the expiration of the Engagement Period.

## 8.  SURVIVAL OF CERTAIN AGREEMENTS.

The covenants and agreements of Contractor set forth in  Article 7 and Article 9 shall all survive the  expiration of the Engagement Period and shall all survive  termination of this Agreement and remain in full force  and effect regardless of the cause of such termination.

## 9.  NOTICES.

All notices required or permitted to be given  hereunder shall be mailed by registered mail or delivered  by hand to the party to whom such notice is required or  permitted to be given hereunder.  If mailed, any such  notice shall be deemed to have been given when mailed as evidenced by the postmark at point of mailing.  If  delivered by hand, any such notice shall be deemed to  have been given when received by the party to whom notice  is given, as evidenced by written and dated receipt of  the receiving party.

Any notice to the Corporation or to any  assignee of the Corporation shall be addressed as  follows:

> CUSTOM RESINS, INC.
> 1421 Highway 136 West
> Henderson, Kentucky

with a copy to:      CUSTOM RESINS, INC.
> 55 Haul Road
> Wayne, New Jersey  07470

-4-



Any notice to Contractor shall be addressed to the address appearing on the records of the Corporation at the time such notice is given.

Either party may change the address to which notice to it is to be addressed, by notice as provided herein.

## 10. WAIVER.

No waiver by either Contractor or the Corporation of any breach of this Agreement shall be deemed to be a waiver of any preceding or succeeding breach thereof.

## 11. INTERPRETATION.

Whenever possible, each paragraph of this Agreement shall be interpreted in such manner as to be effective and valid under applicable law, but if any paragraph is unenforceable or invalid under such law, such paragraph shall be ineffective only to the extent of such unenforceability or invalidity, and the remainder of such paragraph and the balance of this Agreement shall in such event continue to be binding and in full force and effect.

## 12. APPLICABLE LAW.

This Agreement shall be interpreted and enforced in accordance with the laws of Kentucky.

## 13. TERM.

This Agreement shall be automatically renewed for additional one (1) year period at the expiration of the Engagement Period, unless written notice to the contrary is given by either party at least one hundred twenty (120) days prior to its expiration date.

-5-



14. **ENTIRE AGREEMENT.**

This Agreement contains the sole understanding between Contractor and the Corporation with respect to the subject matter contained in this Agreement. This Agreement supersedes any and all previous agreements between Contractor and the Corporation, oral or written, with respect to said subject matter, and this Agreement shall not be modified except in writing signed by the party to be charged.

15. **MISCELLANEOUS.**

Contractor has had the opportunity to have this agreement reviewed by counsel, and has either had same reviewed by counsel or has knowingly waived the right to do so.

**IN WITNESS WHEREOF**, the parties hereto have executed the above Agreement as of the day and year first above written.

**CUSTOM RESINS, INC.**

By: _W. M. Warner_____

Its _____

_Donn Dumouchelle_____

**DONN DUMOUCHELLE**

-6-



## SCHEDULE A

### DUTIES

1.    You will be responsible for the sale to the automotive and allied industries of CRI products, inclusive of all materials under the Nylene label plus other products that might be available from time to time.  [You may represent other manufacturers of non-competitive products subject to our prior consent.]

2.    As "Manager, Automotive Sales", you will report to Mr. Vincent DiMizio, CRI's Sales Manager as related to Sales, and to Messrs. Warner and Schlesinger relative to business matters.

-7-



## <u>SCHEDULE B</u>

### <u>COMPENSATION</u>

1.     Annualized - March 1995 through August 1995 will be $135,000, or $11,250 per month.

2.     September 1995 through February 1997 will be annualized $113,000, or $9,416 per month. The Company will adjust compensation at the end of February 1996 and February 1997 up to the annualized amount, if necessary.

3.     The Company will pay general office expenses of approximately $2,000 per month plus car phone.

4.     Commissions will be 5% on the base price as established by CRI, Henderson, KY. Any price increment above the base will earn commission at a 15% rate.
For example, current base (to be modified as required by market conditions) is:

              Filled        $ 1.20/#
              Homo       $ 1.30/#
              Copolymer  $ 1.50/#
Commission below base to be negotiated.

5.     Minimum Commission will be guaranteed for:

    a.     the first year up to amount of $135,000 annualized compensation;

    b.     the second year up to amount of $113,000 annualized compensation;

6.     Subsequent years will be straight commission with agreed upon adjustments, if necessary.

7.     Compensation and override commissions for additional salesmen that you may retain will be subject to mutual agreement.

8.     CRI, Henderson, Kentucky has the right to buy CRI, Michigan for $1.00 if Donn Dumouchelle's agreement herein is terminated.



EXHIBIT 2

JULY 30, 1996

## AGENT AGREEMENT MEMORANDUM

The attached is a contract engaging Donn Dumouchelle to act as sales agent for Polymeric Resources Corp. in the automotive plastic processing market in the state of Michigan.
A general summary of the contract appears below, and this summary is to be considered a part of that contract.

1.      Agent will work for the Company in the Michigan area focusing on the direct sale of the Company's plastic resins in the automotive arena but not limited to auto end use or the confines of the State per se.

2.      Agent will manage the sales and marketing relationships with the Company surrogates working in the designated area.  The responsibility with these surrogates is to liaison, incentivize, manage and report on their activities in a timely and business manner.

3.      The Company will lease office space, hire administrative personnel and share in certain communication costs incurred by the Agent in the pursuit of this charter.

4.      The Agent will submit monthly reports to the Company and issue from time to time requested reports including pertinent market information relative to the area and the business.

5.      The Agent will submit "Agent Protected" accounts for company approval on an on going basis.  Quarterly, the agent will submit a complete list of both "Agent Active" and "Agent Protected" accounts for approval by the Company.

6.      Compensation, as outlined in Section XI, represents total compensation to be paid to the Agent.

## AGENT AGREEMENT

I.    The following is an Agreement between Polymeric Resources Corporation ("the Company") and Donn Dumouchelle ("the Agent") which when signed by both parties will be binding relative to the tenets contained herein.

II.    The Agreement will be in effect for one year commencing April 1, 1996 and will be renewed automatically for a period of one year thereafter, unless either party effects termination in writing at least sixty (60) days prior to the anniversary date of the Agreement.

III.    The purpose of the Agreement to engage the Agent as Manager of the "Company's" sales and marketing activities, as well as those of affiliates, in the automotive sector as well as the plastic resins consuming community in general in the state of Michigan.   The Agent's duties and responsibilities appear in Section VI.

IV.    The Agent will effect business on behalf of the Company at an office location paid for by the Company within the State of Michigan.   Salaries of office staff will be the responsibility of the Company.
Choice of office location and office staff will be recommended by Agent with final approval from Company.

V.    Fixed assets such as office equipment and telephones will be furnished by the Company.  Annual contribution by the Company to these operating costs is not to exceed the below:

        Fax/Telephone (not auto/cellular)    $ 7,200.00
        Computer, Printer et al              $ 5,000.00

VI.   Duties and responsibilities of Agent as mutually agreed
include:

1.   The Agent is to manage and grow the Company business
(see Section III).

2.   All activities in the Agent's management and/or sale of
plastic materials will be primarily dedicated to the
Company product line and those of affiliates and the
management of sales by the Company or its various sales
channels.  The Agent may represent other manufacturers
of non-competitive products subject to prior written
consent by the Company.

3.   The Agent will be responsible for meeting sales targets
as set forth in the annual plan and objective.
In summary, Agent's proposed target is to go from a
fiscal 1996 target of $7.0 million in sales to $8.7
million in fiscal 1997.

4.   All sales, samples, and requests for pricing and/or
commission adjustments must be approved by the Company
primarily the Vice President Sales, or alternatively,
other executive officers of the Company.

5.   a) All Agent accounts invoiced by the Company will be
designated as "Agent Active" and will be protected
a long as the Agent is contractually bound to the
Company.

b) It is clearly understood that all accounts both
potential and active developed by the Agent are
clearly Company accounts and will be invoiced by
the Company.   Final account credit approval
responsibility rests with the Company.

c) Protected accounts under Agent development will be
classified as "Agent Protected" for reasonable time
periods

d) Agent Active and Agent Protected accounts will be
contacted only by the Agent and by Company
personnel when necessary to effect sales closure,

- 2 -

resolve  problems,  or  maintain  good  business relationships.

6.   The Agent will be responsible for managing the Company's local warehouse stock, maintain adequate inventories, and monitor warehouse activities.

7.   The Agent will submit to the Company on a timely basis monthly  reports  of  activity,  as  well  as  timely information relating to the industry within the Agent's areas of responsibility.

VII.   At no time is the Agent to make any commitments on behalf of the Company without written permission from the Company.

VIII.   Termination for Cause
The Company may unilaterally terminate this Agreement only for "cause".   The term "cause", as used in this Agreement, shall include (a) Agent's breach of any material provision of this Agreement; (b) Agent's willful or repeated failure to comply with the Company's policies, rules and procedures as from time to time in effect; or (c) any conduct, actual or threatened, which is likely to bring public discredit or economic injury to the Company.

IX.   Agent Benefits - Independent Contractor
Agent shall perform his services pursuant to this Agreement as an independent contractor, and will neither act as, nor be deemed, an employee of the Company for any purposes whatever.   Agent shall not be entitled to any medical insurance,  retirement  benefits,  vacations,  sick  pay, severance pay or other benefits or compensation except as set forth herein, nor will Agent acquire insurance coverage required to be provided to employees by any federal, state or local government, or any subdivision thereof.

- 3 -

X.   Covenant Not to Compete.

During the one year period next following the end of the Engagement Period, Agent agrees not to compete as an employee, shareholder, consultant, or otherwise (whether directly or by stock interest or otherwise), in any business or industrial category in which the Company is then substantially involved. The Company may apply to a court of competent jurisdiction for equitable relief in the event of any actual, or threatened breach by Agent of this paragraph. Except as set forth below, the provisions of this paragraph shall not apply in the event of termination of the Agent's engagement without cause prior to the expiration of the Engagement Period.

XI.   Agent compensation will be based upon various activities and/or responsibilities listed below:

1.   Direct Sales to the "Agent Active" accounts.

2.   Sales by Company Distributors, Contractors, or other Agents et al monitored and liaisoned by the Agent namely Tri-State Plastics, P.S.M.I., R-Con (Delta Polymers), Choctaw, Bill Harris (currently called P.S.C.) And any other sales surrogates utilized by the Company in the given territory.

3.   Sales of resins for the manufacture of convoluted tubing to APT through Tri-State Polymers.

4.   Sales to compounders.

5.   Sales related to tolling.

6.   "Shared Commissions": Defined as sales of automotive resins where agent was instrumental in obtaining end user approval, but the material is processed in geographies outside the Agent's territory.

7.   Compensation Agreement:

1. Direct Sales

a)   8% of invoiced price per pound

- 4 -

b) From time to time circumstances that diminish acceptable direct sales margins will affect the standard 8% commission and a lesser percentage of the invoiced price will be mutually agreed upon.

2. <u>Distributors, Agents, etc.</u> -- 3% of invoiced price per pound

3. <u>A.P.T.</u> -- 1/2¢ per pound

4. <u>Compounders</u> -- $0.02 per pound

5. <u>Tolling</u> --TBD on an account by account basis

6. <u>Shared Commissions</u> will be on a basis of 25% for the Agent and 75% for the Salesman or surrogate calling on and maintaining contact at the processing account/location.

7. <u>Convoluted Tubing</u> resin sales commissions, other than sales to A.P.T., will be taken on a case by case basis.

Commissions will be paid monthly and will only be paid upon receipt of monies due from invoiced accounts.

XII.  Secrets.

Agent agrees that any trade secrets or any other like information of value relating to the business and/or field of interest of the Company, any affiliate, including but not limited to, information relating to inventions, disclosures, processes, systems, methods, formulae, patents, patent applications, machinery, materials, research activities and plans, costs of production, contract forms, prices, volume of sale, promotional methods, list of names or classes of customers, which he has heretofore acquired during this engagement by the Company, which he may hereafter acquire during the Engagement Period as the result of any disclosures to him, or in any other way, shall be regarded as held by him in a fiduciary capacity solely for the benefit of the Company, its successors or assigns, and shall not at any time, either during the term of this Agreement or thereafter, be disclosed, divulged, furnished, or made accessible by him to anyone, or be otherwise used by him, except in the regular course of business of the Company or its clients.   Information shall for

- 5 -

purposes of this Agreement be considered to be secret if not known by the trade generally, even though such information may have been disclosed to one or more third parties pursuant to distribution agreements, joint research agreements or other agreements entered into by the Company or any of its clients.

XIII. Compensation Upon Termination.

(a)   In the event of (i) termination of this Agreement by the Company for cause, or (ii) if the Agent elects not to renew as provided hereunder, the Company's sole obligation shall be to pay compensation due for sales to the date of such termination.

(b)   In the event of (i) termination by the Company without cause or (ii) the Company elects not to renew this agreement and provided that the Agent fully complies with the provisions of paragraphs X and XII hereof, Company agrees to pay Agent for the twelve months following termination an amount equal to 50% of the compensation set forth in Article XI hereof provided that the Agent may elect to not to comply with the provisions of paragraphs X and XII hereof in which event the Company's sole obligation shall be to pay compensation due for sales to the date of such termination.

XIV.   Closing.
        Agent agrees that use of the name "Custom Resins" is merely
        a license for the Company and Agent has no proprietary right
        thereto or to any variation thereof.

Dated: _____1/30/96_____          Dated: _7/31/96_____

POLYMERIC RESOURCES CORP.

_____          _____
Sol Schlesinger                        Donn Dumouchelle

- 6 -

EXHIBIT 3

## CARLET, GARRISON, KLEIN & ZARETSKY, L.L.P.
ATTORNEYS AT LAW
1135 CLIFTON AVENUE, SUITE 104
P.O. BOX 2666
CLIFTON, NEW JERSEY 07015-2666
(973) 777-6200
FAX: (973) 777-0412

FRANK A. CARLET*
MICHAEL J. ZARETSKY**
CHARLES RABOLLI, JR.
VIRGINIA T. SHEA**
   * NJ & DC BAR
   ** NJ & NY BAR
   ***NJ, NY, DC

OF COUNSEL
NORMAN I. KLEIN**
AMOS C. SAUNDERS
LAURENCE C. STERN***
GEORGE L. GARRISON

NEW YORK OFFICE
645 FIFTH AVENUE, SUITE 703
NEW YORK, NEW YORK 10022
(212) 869-2147

November 18, 2010

Via Federal Express & Email
Dennis M. Rauss, Esq.
Giarmarco, Mullins & Horton, P.C.
Tenth Floor Columbia Center
101 West Big Beaver Road
Troy, MI 48084-5280

re:   Polymeric Resources Corp. and Custom Resins, Inc.

Dear Mr. Rauss:

This office represents Polymeric Resources Corp. and Custom Resins, Inc.

I have been advised that you indicated in a phone message to Ron Bailey, Vice President of Sales and Marketing for Polymeric and Custom Resins that you represent Donn Dumochelle and left a message that unless you heard from him immediately, you intended to file a lawsuit against him and Jeremy Bleirn.

When apprised of this, I immediately called and left a message on your voicemail indicating who I was and that all further contact regarding this matter should be with me and not with Mr. Bailey or Mr. Bleirn or any other representative of Polymeric or Custom Resins.

As you may know, Mr. Dumochelle was an independent sales agent for Polymeric and Custom Resins. In that capacity, he secured orders from customers of my clients. Unfortunately, last year about this time, he suffered a debilitating stroke and has been unable to render any services to my clients since that date. His wife has apparently tried to assist in some way, but does not seem to be in a position to do so.

Obviously, we have allowed the situation to continue in the hope that Mr. Dumochelle would recover. It appears that he has not; and at this point, my client must proceed to take those steps which are necessary for it to continue its business operations. In that regard, we have attempted, without success, to discuss with Ms. Dumochelle, a fair and reasonable parting of the ways. That has not happened for reasons best known to Mrs. Dumochelle and her advisors.

**CARLET, GARRISON, KLEIN & ZARETSKY, L.L.P.**

ATTORNEYS AT LAW

Dennis M. Rauss, Esq.
November 18, 2010
Page 2

In the meantime, we have learned that last evening someone, either Ms. Dumochelle or someone on her behalf, entered the offices of Custom Resins of Michigan, Inc. and removed all of the hardcopy files that were kept there.

These files contain information relating to customers of Polymeric and Custom Resins. As such, those records belong to and need to be returned immediately to Polymeric and Custom Resins, because they are critical to the continuation of my clients' business in Michigan. This improper conversion of these files must be corrected immediately.

Please be advised that unless these files are returned to my client by Monday, November 22, 2010, you will leave me no alternative but to advise my client to take such steps as may be necessary and appropriate to enforce its rights and to recover such damages as have been and continue to be sustained by my client as a result of this improper and inappropriate action that has been taken by your client or someone on her behalf.

The relationship between Mr. Dumochelle and my clients has been a good and profitable relationship for many years, which has benefited both parties. It would be truly unfortunate for this relationship to end in litigation, which will no doubt result in substantial cost and expense to your client. I trust that you would prevail upon your client to rethink her actions and to return those files immediately.

Thank you for your courtesy and cooperation.

Very truly yours,

CARLET, GARRISON, KLEIN
& ZARETSKY, L.L.P.

By: _____
Norman I. Klein

NIK:ps

cc:   Herman Friedman
      Arthur Quint